MICHAEL R. LOZEAU (State Bar No. 142893)
DOUGLAS J. CHERMAK (State Bar No. 233382)
Law Office of Michael R. Lozeau
1516 Oak Street, Suite 216
Alameda, CA 94501
Tel: (510) 749-9102
Fax: (510) 749-9103 (fax)
E-mail: mrlozeau@lozeaulaw.com

ANDREW L. PACKARD (State Bar No. 168690)
MICHAEL P. LYNES (State Bar No. 230462)
Law Offices of Andrew L. Packard
319 Pleasant Street
Petaluma, CA 94952
Tel: (707) 763-7227
Fax: (415) 763-9227
E-mail: andrew@packardlawoffices.com

Attorneys for Plaintiff
CALIFORNIA SPORTFISHING
PROTECTION ALLIANCE

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, a non-profit corporation,<br><br>Plaintiff,<br><br>vs.<br><br>AARON METALS COMPANY, a corporation.<br><br>Defendant. | Case No. C07-03547 WHA<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387) |

CALIFORNIA SPORTFISHING PROTECTION ALLIANCE by and through its counsel, hereby alleges:

I. **JURISDICTION AND VENUE**

1.    This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq.* (the "Clean Water Act" or "the Act"). This Court has subject matter jurisdiction over the parties and the subject matter

1  of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28

2  U.S.C. § 1331 (an action arising under the laws of the United States).  The relief requested is

3  authorized pursuant to 28 U.S.C. §§ 2201-02 (power to issue declaratory relief in case of

4  actual controversy and further necessary relief based on such a declaration); 33 U.S.C. §§

5  1319(b), 1365(a) (injunctive relief); and 33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

6      2.    On or about March 18, 2007, Plaintiff provided notice of Defendant's

7  violations of the Act, and of its intention to file suit against Defendant, to the Administrator

8  of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA

9  Region IX; the Executive Director of the State Water Resources Control Board ("State

10  Board"); and to the Executive Officer of the Regional Water Quality Control Board, San

11  Francisco Bay Region ("Regional Board").  By no later than March 22, 2007, Plaintiff

12  provided notice to Defendant, as required by the Act, 33 U.S.C. § 1365(b)(1)(A).  A true and

13  correct copy of CSPA's notice letter is attached as Exhibit A, and is incorporated by

14  reference.

15      3.    More than sixty days have passed since notice was served on Defendant and

16  the State and federal agencies.  Plaintiff is informed and believes, and thereupon alleges, that

17  neither the EPA nor the State of California has commenced or is diligently prosecuting a

18  court action to redress the violations alleged in this complaint.  This action's claim for civil

19  penalties is not barred by any prior administrative penalty under Section 309(g) of the Act,

20  33 U.S.C. § 1319(g).

21      4.    Venue is proper in the Northern District of California pursuant to Section

22  505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located

23  within this judicial district.  Pursuant to Local Rule 3-2(c), intradistrict venue is proper in

24  Oakland, California because the sources of the violations are located within Alameda

25  County, California.

26  **II.    INTRODUCTION**

27      5.    This complaint seeks relief for Defendant's discharges of polluted storm water

28  and non-storm water pollutants from Defendant's facility ("the Facility") into the waters of

COMPLAINT

2

the United States in violation of the Act and the State of California's "Waste Discharge Requirements (WDRs) For Discharges of Storm Water Associated With Industrial Activities Excluding Construction Activities," State Water Resources Control Board ("State Board") Water Quality Order No. 91-13-DWQ, as amended by Water Quality Order No. 92-12-DWQ and Water Quality Order No. 97-03-DWQ, National Pollutant Discharge Elimination System ("NPDES") Permit No. CAS000001, (hereinafter "the Order" or "Permit").  Defendant's violations of the discharge, treatment technology, monitoring requirements, and other procedural and substantive requirements of the Permit and the Act are ongoing and continuous.

6.    The failure on the part of persons and facilities such as Defendant and its industrial facility to comply with storm water requirements is recognized as a significant cause of the continuing decline in water quality of the San Leandro Bay, San Francisco Bay ("Bay"), and other area receiving waters.  The general consensus among regulatory agencies and water quality specialists is that storm pollution amounts to a substantial portion of the total pollution entering the aquatic environment each year.  With every rainfall event, millions of gallons of polluted rainwater originating from industries within the surrounding area pour into the Bay.

7.    The continuing decline in water quality in the San Francisco Bay is a matter of serious public concern.  Data gathered by CalFed, a coalition of fifteen state and federal agencies analyzing water allocation issues, has confirmed that the Bay is a heavily polluted water body.  The entire Bay, all of its major tributaries, and the waterways in and around the city of Oakland have all been identified by the State Board, the Regional Board, and EPA as impaired water bodies under Section 303(d) of the Clean Water Act.  33 U.S.C. § 1313(d).

III.    **PARTIES**

8.    Plaintiff CALIFORNIA SPORTFISHING PROTECTION ALLIANCE ("CSPA") is a non-profit public benefit corporation organized under the laws of the State of California with its main office in Stockton, California. CSPA has approximately 2,000 members who live, recreate and work in and around waters of the State of California,

COMPLAINT

3

1 including the San Leandro Bay and San Francisco Bay.  CSPA is dedicated to the

2 preservation, protection, and defense of the environment, the wildlife and the natural

3 resources of all waters of California.  To further these goals, CSPA actively seeks federal

4 and state agency implementation of the Act and other laws and, where necessary, directly

5 initiates enforcement actions on behalf of itself and its members.

6       9.     Members of CSPA reside in and around the Bay and enjoy using the Bay for

7 recreation and other activities.  Members of CSPA use and enjoy the waters into which

8 Defendant has caused, is causing, and will continue to cause, pollutants to be discharged.

9 Members of CSPA use those areas to fish, sail, boat, kayak, swim, bird watch, view wildlife

10 and engage in scientific study including monitoring activities, among other things.

11 Defendant's discharges of pollutants threaten or impair each of those uses or contribute to

12 such threats and impairments.  Thus, the interests of CSPA's members have been, are being,

13 and will continue to be adversely affected by Defendant's failure to comply with the Clean

14 Water Act and the Permit.  The relief sought herein will redress the harms to Plaintiff caused

15 by Defendant's activities.

16       10.    Continuing commission of the acts and omissions alleged above will irreparably

17 harm Plaintiff and the citizens of the State of California, for which harm they have no plain,

18 speedy or adequate remedy at law.

19       11.    Plaintiff is informed and believes, and thereupon alleges, that Defendant

20 AARON METALS COMPANY (hereinafter "Defendant" or "Aaron Metals") is a

21 corporation organized under the laws of California.  Defendant Aaron Metals operates a non-

22 ferrous scrap metal recycling facility in Oakland, California.

23 **IV.**    **STATUTORY BACKGROUND**

24       12.    Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any

25 pollutant into waters of the United States, unless such discharge is in compliance with

26 various enumerated sections of the Act.  Among other things, Section 301(a) prohibits

27 discharges not authorized by, or in violation of, the terms of an NPDES permit issued

28 pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

COMPLAINT

4

13.     Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program.  33 U.S.C. § 1342(p).  States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers.  33 U.S.C. § 1342(p).

14.     Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the U.S. EPA has authorized California's State Board to issue NPDES permits including general NPDES permits in California.

15.     The State Board elected to issue a statewide general permit for industrial storm water discharges.  The State Board issued the General Permit on or about November 19, 1991, modified the General Permit on or about September 17, 1992, and reissued the General Permit on or about April 17, 1997, pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

16.     In order to discharge storm water lawfully in California, industrial dischargers must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit.  33 U.S.C. § 1311(a).

17.     The General Permit contains several prohibitions.  Effluent Limitation B(3) of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.  BAT and BCT include both nonstructural and structural measures. General Permit, Section A(8).  Discharge Prohibition A(2) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance. Receiving Water Limitation C(1) of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment. Receiving Water Limitation C(2) of the General Permit prohibits storm water discharges that

1    cause or contribute to an exceedance of any applicable water quality standards contained in

2    Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

3        18.    EPA has established Parameter Benchmark Values as guidelines for

4    determining whether a facility discharging industrial storm water has implemented the

5    requisite BAT and BCT. 65 Fed. Reg. 64746, 64767 (Oct. 30, 2000).  EPA has established

6    Parameter Benchmark Values for the following parameters, among others: total suspended

7    solids – 100 mg/L; oil/grease – 15 mg/L; total organic carbon – 110 mg/L; aluminum – 0.75

8    mg/L; iron – 1 mg/L; zinc – 0.117 mg/L; copper – 0.0636 mg/L; lead – 0.0816 mg/L; and

9    chemical oxygen demand – 120 mg/L.  The California State Water Resources Control Board

10   has proposed a Benchmark Value for electrical conductance of 200 μmhos/cm.

11       19.    In addition to absolute prohibitions, the General Permit contains a variety of

12   substantive and procedural requirements that dischargers must meet. Facilities discharging,

13   or having the potential to discharge, storm water associated with industrial activity that have

14   not obtained an individual NPDES permit must apply for coverage under the State's General

15   Permit by filing a Notice of Intent To Comply ("NOI").  The General Permit requires

16   existing dischargers to have filed their NOIs before March 30, 1992.

17       20.    Dischargers must develop and implement a Storm Water Pollution Prevention

18   Plan ("SWPPP").  The SWPP must describe storm water control facilities and measures that

19   comply with the BAT and BCT standards.  The General Permit requires that an initial

20   SWPPP have been developed and implemented before October 1, 1992.  The SWPPP must,

21   among other requirements, identify and evaluate sources of pollutants associated with

22   industrial activities that may affect the quality of storm and non-storm water discharges from

23   the facility and identify and implement site-specific best management practices ("BMPs") to

24   reduce or prevent pollutants associated with industrial activities in storm water and

25   authorized non-storm water discharges (Section A(2)).  The SWPPP's BMPs must

26   implement BAT and BCT (Section B(3)).  The SWPPP must include: a description of

27   individuals and their responsibilities for developing and implementing the SWPP (Section

28   A(3)); a site map showing the facility boundaries, storm water drainage areas with flow

COMPLAINT

6

1   pattern and nearby water bodies, the location of the storm water collection, conveyance and

2   discharge system, structural control measures, impervious areas, areas of actual and potential

3   pollutant contact, and areas of industrial activity (Section A(4)); a list of significant materials

4   handled and stored at the site (Section A(5)); a description of potential pollutant sources

5   including industrial processes, material handling and storage areas, dust and particulate

6   generating activities, and a description of significant spills and leaks, a list of all non-storm

7   water discharges and their sources, and a description of locations where soil erosion may

8   occur (Section A(6)).  The SWPPP must include an assessment of potential pollutant sources

9   at the Facility and a description of the BMPs to be implemented at the Facility that will

10  reduce or prevent pollutants in storm water discharges and authorized non-storm water

11  discharges, including structural BMPs where non-structural BMPs are not effective (Section

12  A(7), (8)). The SWPPP must be evaluated to ensure effectiveness and must be revised where

13  necessary (Section A(9),(10)).

14      21.     Section C(11)(d) of the General Permit's Standard Provisions requires

15  dischargers to report any noncompliance to the Regional Board.  *See also* Section E(6).

16  Lastly, Section A(9) of the General Permit requires an annual evaluation of storm water

17  controls including the preparation of an evaluation report and implementation of any

18  additional measures in the SWPPP to respond to the monitoring results and other inspection

19  activities.

20      22.     The General Permit requires dischargers commencing industrial activities

21  before October 1, 1992 to develop and implement an adequate written monitoring and

22  reporting program no later than October 1, 1992.  Existing facilities covered under the

23  General Permit must implement all necessary revisions to their monitoring programs no later

24  than August 1, 1997.

25      23.     As part of their monitoring program, dischargers must identify all storm water

26  discharge locations that produce a significant storm water discharge, evaluate the

27  effectiveness of BMPs in reducing pollutant loading, and evaluate whether pollution control

28  measures set out in the SWPPP are adequate and properly implemented.  Dischargers must

COMPLAINT

conduct visual observations of these discharge locations for at least one storm per month during the wet season (October through May) and record their findings in their Annual Report. Dischargers must also collect and analyze storm water samples from at least two storms per year. Section B(5)(a) of the General Permit requires that dischargers "shall collect storm water samples during the first hour of discharge from (1) the first storm event of the wet season, and (2) at least one other storm event in the wet season. All storm water discharge locations shall be sampled." Section B(5)(c)(i)-(iii) requires dischargers to sample and analyze during the wet season for basic parameters, such as pH, total suspended solids ("TSS"), electrical conductance, and total organic content ("TOC") or oil and grease ("O&G"), certain industry-specific parameters, and toxic chemicals and other pollutants likely to be in the storm water discharged from the facility. Section B(5) and Table D of the General Permit requires dischargers whose industrial activities fall within SIC Code 5093 to analyze their storm water discharge samples for zinc, aluminum, iron, lead, and chemical oxygen demand ("COD"). Dischargers must also conduct dry season visual observations to identify sources of non-storm water pollution.

24.    Section B(14) of the General Permit requires dischargers to submit an annual report by July 1 of each year to the executive officer of the relevant Regional Board. The annual report must be signed and certified by an appropriate corporate officer. Sections B(14), C(9), (10). Section A(9)(d) of the General Permit requires the discharger to include in their annual report an evaluation of their storm water controls, including certifying compliance with the General Permit. *See also* Sections C(9) and (10) and B(14).

25.    Section 505(a)(1) and Section 505(f) of the Act provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements. 33 U.S.C. §§1365(a)(1) and (f), § 1362(5). An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a). Violators of the Act are also subject to an assessment of civil penalties of up to $27,500 per day (violations from January 30, 1997 through March 15, 2004) and $32,500 per day (violations after March 15, 2004) pursuant to Sections 309(d) and 505 of the Act, 33

COMPLAINT

8

1  U.S.C. §§ 1319(d), 1365 and 40 C.F.R. §§ 19.1 - 19.4.

2      26.    The Regional Board has established water quality standards for the San

3  Francisco Bay in the Water Quality Control Plan for the San Francisco Bay Basin, generally

4  referred to as the Basin Plan.

5      27.    The Basin Plan includes a narrative toxicity standard which states that "[a]ll

6  waters shall be maintained free of toxic substances in concentrations that are lethal to or that

7  produce other detrimental responses in aquatic organisms."

8      28.    The Basin Plan provides that "[w]aters shall not contain suspended material in

9  concentrations that cause nuisance or adversely affect beneficial uses" and that "[w]aters

10  shall not contain biostimulatory substances in concentrations that promote aquatic growths to

11  the extent that such growths cause nuisance or adversely affect beneficial uses."

12      29.    The Basin Plan dictates that "[w]aters shall be free of changes in turbidity that

13  cause nuisance or adversely affect beneficial uses."

14      30.    The Basin Plan provides that "[w]aters shall not contain suspended material in

15  concentrations that cause nuisance or adversely affect beneficial uses."

16      31.    The Basin Plan provides that "[w]aters shall not contain oils, greases, waxes,

17  or other materials in concentrations that result in a visible film or coating on the surface of

18  the water or on objects in the water, that cause nuisance, or that otherwise adversely affect

19  beneficial uses."

20      32.    The Basin Plan establishes Marine Water Quality Objectives for the following

21  pollutants: zinc – 0.081 mg/L (4-day average), 0.090 mg/L (1-hour average); lead – 0.0081

22  mg/L (4-day average), 0.22 mg/L (1-hour average).

23      33.    EPA has established numeric water quality standards for priority toxic

24  pollutants, including criteria intended to protect aquatic life.  These include (at a hardness of

25  100 mg/L): copper – 0.009 mg/L; and zinc – 0.120 mg/L.  EPA has also established a

26  numeric water quality criterion for aluminum of 0.087 mg/L.

27  V.    **STATEMENT OF FACTS**

28      34.    Defendant Aaron Metals Company operates a metal recycling facility at 750

COMPLAINT
                                              9

1  105th Avenue in Oakland, California.  The Facility is engaged in non-ferrous scrap metal

2  recycling.  The Facility falls within the Standard Industrial Classification ("SIC") Code

3  5093.  The Facility covers about 2 acres, the majority of which is paved and used for storing

4  and processing different types of metal and miscellaneous equipment, including large

5  forklifts and other vehicles.  On information and belief, Plaintiff alleges that there are several

6  buildings located on the property.  On information and belief, Plaintiff alleges that metal

7  recycling is conducted both inside and outside of these buildings.  Metal is transported in

8  and out of these buildings for storage in the paved and unpaved areas of the Facility.

9       35.    Defendant channels and collects storm water falling on the Facility though two

10  storm water outfalls.  Storm water discharged from each outfall enters municipal storm

11  drains near the Facility.  One drain, located at 105th Avenue, is adjacent to the Facility.  The

12  other drain, located on Pearmain Street, is on a nearby street.  Plaintiff is informed and

13  believes, and thereupon alleges that, water discharged to the storm drains flows to San

14  Leandro Bay.  San Leandro Bay is an embayment of the San Francisco Bay.

15       36.    The industrial activities at the site include the storage, processing, and

16  recycling of a variety of metals including aluminum, copper, brass, stainless steel, nickel,

17  titanium, lead, insulated wire, high temp alloys, gold, silver, and platinum.  It also includes

18  the storage, maintenance, and cleaning of equipment used to process and recycle metals, and

19  the outdoor handling, processing, and storage of various materials used in the recycling

20  process.

21       37.    Significant activities at the site take place outside and are exposed to rainfall.

22  These activities include the storage of scrap and recycled metals, equipment used in the

23  recycling processes; the storage and use of vehicles and equipment for materials handling;

24  and the storage, handling, and disposal of waste materials.  Loading and delivery of scrap

25  and recycled metals occurs outside.  Trucks enter and exit the Facility directly from and to a

26  public road.  Fork lifts are the primary means of moving scrap and recycled metals around

27  the unpaved storage areas of the Facility.  Plaintiff is informed and believes, and thereupon

28  alleges, that metal recycling activities also occur in exposed areas at the Facility.  The

COMPLAINT

Facility's exposed areas contain large quantities of scrap and recycled metals. Plaintiff alleges on information and belief that many of the exposed surfaces at the Facility include metal shavings, filings, fines, and other materials that are the result of the metal recycling process. These areas are exposed to storm water and storm flows due to the lack of overhead coverage, berms and other storm water controls.

38.    Industrial machinery and heavy equipment, including trucks and trailers are operated and stored at the Facility in areas exposed to storm water flows. Plaintiff is informed and believes, and thereupon alleges, that such machinery and equipment leak contaminants such as oil, grease, diesel fuel, anti-freeze and hydraulic fluids that are exposed to storm water flows. Trucks leaving the Facility track substantial amounts of material onto 105th Avenue. During rain events, material that has been tracked onto 105th Avenue from the Facility during dry weather is transported via storm water to storm drain channels.

39.    Plaintiff is informed and believes, and thereupon alleges that the storm water flows easily over the surface of the Facility, collecting suspended sediment, dirt, oils, grease, metals, and other pollutants as it flows toward the storm water drains. Storm water and any pollutants contained in that storm water entering the drains flows directly to the storm drains adjacent to the Facility.

40.    The management practices at the Facility are wholly inadequate to prevent the sources of contamination described above from causing the discharge of pollutants to waters of the United States. The Facility lacks sufficient structural controls such as grading, berming, roofing, containment, or drainage structures to prevent rainfall and storm water flows from coming into contact with these and other exposed sources of contaminants. The Facility lacks sufficient structural controls to prevent the discharge of water once contaminated. The Facility lacks adequate storm water pollution treatment technologies to treat storm water once contaminated. The Facility lacks any structural controls to prevent the tracking of pollutants onto 105th Avenue.

41.    Since at least December 16, 2002, Defendant has taken samples or arranged for samples to be taken of storm water discharges at the Facility. The sample results were

COMPLAINT

1    reported in the Facility's annual reports submitted to the Regional Board.  Defendant Aaron

2    Metals certified each of those annual reports pursuant to Sections A and C of the General

3    Permit.

4        42.    Since at least December 16, 2002, the Facility has detected iron, aluminum,

5    copper, total suspended solids, oil and grease, and electrical conductance in storm water

6    discharged from the Facility.  Levels of these pollutants detected in the Facility's storm

7    water have been in excess of EPA's numeric parameter benchmark values.   Levels of these

8    pollutants detected in the Facility's storm water have been in excess of water quality

9    standards established in the Basin Plan.

10       43.    The levels of iron detected by the Facility in its storm water have exceeded the

11   benchmark value for iron of 1.0 mg/L established by EPA.  For example, on January 30,

12   2006, the level of iron measured by Defendant in the Facility's discharged storm water was

13   5.1 mg/L.  That level of iron is over five times the benchmark value for iron established by

14   EPA.  That level of iron is seventeen times the 0.3 mg/L maximum contaminant level for

15   iron incorporated by the Basin Plan as a water quality standard for the San Francisco Bay

16   region.

17       44.    The levels of aluminum detected by the Facility in its storm water have

18   exceeded the benchmark value for aluminum of 0.75 mg/L established by EPA.  For

19   example, on December 16, 2002, the level of aluminum measured by Defendant in the

20   Facility's discharged storm water was 41.0 mg/L.  That level of aluminum is nearly fifty-five

21   times the benchmark value for aluminum established by EPA.

22       45.    The levels of copper detected by the Facility in its storm water have exceeded

23   the benchmark value for copper of 0.0636 mg/L established by EPA.  For example, on

24   January 30, 2006, the level of copper measured by Defendant in the Facility's discharged

25   storm water was 0.88 mg/L.  That level of copper is nearly fourteen times the benchmark

26   value for copper established by EPA.

27       46.    The levels of total suspended solids in storm water detected by the Facility

28   have exceeded the benchmark value for total suspended solids of 100 mg/L established by

COMPLAINT

EPA. For example, on December 16, 2002, the level of suspended solids measured by Defendant in the Facility's discharged storm water was 790 mg/L. That level of total suspended solids is nearly eight times the benchmark value for suspended solids established by EPA.

47.    The levels of oil and grease in storm water detected by the Facility have exceeded the benchmark value for oil and grease of 15 mg/L established by EPA. For example, on December 16, 2002, the level of oil and grease measured by Defendant in the Facility's discharged storm water was 76 mg/L. That level of oil and grease is over five times the benchmark value for oil and grease established by EPA.

48.    The electrical conductance levels detected by the Facility in its storm water have been greater than the numeric water quality standards applicable to electrical conductance in California. The electrical conductance levels detected by the Facility in its storm water have been greater than the benchmark value of 200 μmho/cm proposed by the State Board. For example, on December 16, 2002, the electrical conductance level measured by Defendant in the Facility's discharged storm water was 400 μmho/cm. That electrical conductance level is two times the State Board's proposed benchmark value.

49.    On information and belief, Plaintiff alleges that Defendants have failed to analyze its storm water samples for COD as required by the Table D of the General Permit since at least December 16, 2002.

50.    On information and belief, Plaintiff alleges that Defendants have failed to analyze its storm water samples for copper as required by Section B(5)(c)(iii) of the General Permit since at least December 16, 2002, through March 29, 2005.

51.    On information and belief, Plaintiff alleges that Defendants have failed to analyze its storm water samples for iron as required by the Table D of the General Permit since at least December 16, 2002, through March 29, 2005.

52.    On information and belief, Plaintiff alleges that Defendants have failed to analyze its storm water samples for zinc as required by the Table D of the General Permit since at least December 16, 2002.

53.    On information and belief, Plaintiff alleges that Defendants have failed to analyze its storm water samples for lead as required by the Table D of the General Permit since at least December 16, 2002.

54.    On information and belief, Plaintiff alleges that since at least December 16, 2002, Defendant has failed to implement BAT and BCT at the Facility for its discharges of suspended solids, iron, electrical conductance, zinc, lead, copper, COD, aluminum, oil and grease, and other pollutants.  Section B(3) of the General Permit requires that Defendant implement BAT for toxic and nonconventional pollutants and BCT for conventional pollutants by no later than October 1, 1992.  As of the date of this Complaint, Defendant has failed to implement BAT and BCT.

55.    On information and belief, Plaintiff alleges that since at least October 1, 1992, Defendant has failed to implement an adequate Storm Water Pollution Prevention Plan ("SWPPP") for the Facility.  Plaintiff is informed and believes, and thereupon alleges, that the SWPPP prepared for the Facility does not set forth site-specific best management practices for the Facility that are consistent with BAT or BCT for the Facility.  Plaintiff is informed and believes, and thereupon alleges, that the SWPPP prepared for the Facility does not include an assessment of potential pollutant sources, structural pollutant control measures employed by the Defendant, a list of actual and potential areas of pollutant contact, or a description of best management practices to be implemented at the Facility to reduce pollutant discharges.  According to information available to CSPA, Defendant's SWPPP has not been evaluated to ensure effectiveness and revised where necessary to further reduce pollutant discharges.  Plaintiff is informed and believes, and thereupon alleges, that the SWPPP does not include each of the mandatory elements required by Section A of the General Permit.  Plaintiff is informed and believed that the SWPPP does not contain an accurate map that clearly delineates the boundaries of the Facility.

56.    Information available to CSPA indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events from the Facility directly to storm drains that flow into San Leandro Bay and San Francisco Bay.

COMPLAINT

57.    The San Francisco Bay has been identified by the Regional Board, State Board and federal EPA as impaired for several pollutants, including mercury and unknown toxicity.

58.    Plaintiff is informed and believes, and thereupon alleges, that pollutants discharged by the Facility in its storm water are contributing to violations of water quality standards that currently exist in the San Francisco Bay.  Plaintiff is informed and believes, and thereupon alleges, that Defendant is discharging copper, lead, iron, zinc, aluminum, suspended solids, and other un-monitored pollutants that are causing or contributing to exceedances of applicable water quality standards.  Defendant is contributing to violations of water quality standards including, but not limited to, the narrative water quality standard for toxicity and the numeric water quality standard for electrical conductance.

59.    Plaintiff is informed and believes, and thereupon alleges, that, Defendant has failed and continues to fail to alter the Facility's SWPPP and site-specific BMPs consistent with Section A(9) of the General Permit.

60.    Plaintiff is informed and believes that Defendant failed submit to the Regional Board a true and complete annual report certifying compliance with the General Permit since at least December 16, 2002.  Pursuant to Sections A(9)(d), B(14), and C(9), (10) of the General Permit, Defendant must submit an annual report, that is signed and certified by the appropriate corporate officer, outlining the Facility's storm water controls and certifying compliance with the General Permit.  Plaintiff is informed and believes, and thereupon alleges, that Defendant has signed incomplete annual reports that purported to comply with the General Permit when there was significant noncompliance at the Facility.

61.    Information available to Plaintiff indicates that Defendant has not fulfilled the requirements set forth in the General Permit for discharges from the Facility due to the continued discharge of contaminated storm water.  Plaintiff is informed and believes, and thereupon alleges, that all of the violations alleged in this Complaint are ongoing and continuing.

COMPLAINT

## VI.    CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Failure to Develop and Implement the Best Available and
Best Conventional Treatment Technologies
(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

62.     Plaintiff realleges and incorporate Paragraphs 1-61, as if fully set forth herein.

63.     The General Permit's SWPPP requirements and Effluent Limitation B(3) require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.  Defendant has failed to implement BAT and BCT at the Facility for its discharges of suspended solids, iron, aluminum, electrical conductance, zinc, and other un-monitored pollutants in violation of Effluent Limitation B(3) of the General Permit.

64.     Each day since October 1, 1992 that Defendant has failed to develop and implement BAT and BCT in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

65.     Defendant has been in violation of the BAT/BCT requirements every day since October 1, 1992.  Defendant continues to be in violation of the BAT/BCT requirements each day that it fails to develop and fully implement an adequate BAT/BCT for the Facility.

### SECOND CAUSE OF ACTION
**Failure to Prepare, Implement, Review, and Update
an Adequate Storm Water Pollution Prevention Plan
(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

66.     Plaintiff realleges and incorporate Paragraphs 1-65, as if fully set forth herein.

67.     Section A and Provision E of the General Permit requires dischargers of storm water associated with industrial activity to develop and implement an adequate SWPPP no later than October 1, 1992.

68.     Defendant has failed to develop and implement an adequate SWPPP for the Facility.  Defendant's ongoing failure to develop and implement an adequate SWPPP for the Facility is evidenced by, *inter alia*, Defendant's outdoor storage of metals, including manufacturing and waste materials, without appropriate best management practices; the continued exposure of significant quantities of raw and finished materials to storm water flows;

1    the continued exposure and tracking of waste resulting from the operation or maintenance of

2    vehicles at the site, including trucks and forklifts, the failure to either treat storm water prior to

3    discharge or to implement effective containment practices; and the continued discharge of

4    storm water pollutants from the Facility at levels in excess of EPA benchmark values.

5        69.    Defendant has failed to update the Facility's SWPPP in response to the

6    analytical results of the Facility's storm water monitoring.

7        70.    Each day since October 1, 1992 that Defendant has failed to develop, implement

8    and update an adequate SWPPP for the Facility is a separate and distinct violation of Section

9    301(a) of the Act, 33 U.S.C. § 1311(a).

10        71.    Defendant has been in violation of the SWPPP requirements every day since

11    October 1, 1992.  Defendant continues to be in violation of the SWPPP requirements each day

12    that it fails to develop and fully implement an adequate SWPPP for the Facility.

13                    **THIRD CAUSE OF ACTION**
**Failure to Develop and Implement an Adequate Monitoring and Reporting Program**
14    **(Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

15        72.    Plaintiff re-alleges and incorporates Paragraphs 1-71, inclusive, as if fully set

16    forth herein.

17        73.    Section B of the General Permit requires dischargers of storm water associated

18    with industrial activity to develop and implement a monitoring and reporting program

19    (including, *inter alia*, sampling and analysis of discharges) no later than October 1, 1992.

20        74.    Defendant has failed to develop and implement an adequate monitoring and

21    reporting program for the Facility.  Defendant's ongoing failure to develop and implement

22    an adequate monitoring and reporting program are evidenced by, *inter alia*, their failure to

23    monitor for requisite pollution parameters.

24        75.    Each day since October 1, 1992 that Defendant has failed to develop and

25    implement an adequate monitoring and reporting program for the Facility in violation of the

26    General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. §

27    1311(a).  The absence of requisite monitoring and analytical results are ongoing and

28    continuous violations of the Act.

COMPLAINT
                                    17

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## FOURTH CAUSE OF ACTION
### Discharges of Contaminated Storm Water
### in Violation of Permit Conditions and the Act
### (Violations of 33 U.S.C. §§ 1311(a), 1342)

76.    Plaintiff re-alleges and incorporates Paragraphs 1-75, inclusive, as if fully set forth herein.

77.    Discharge Prohibition A(2) of the General Permit requires that storm water discharges and authorized non-storm water discharges shall not cause or threaten to cause pollution, contamination, or nuisance.  Receiving Water Limitations C(1) and C(2) of the General Permit require that storm water discharges and authorized non-storm water discharges shall not adversely impact human health or the environment, and shall not cause or contribute to a violation of any water quality standards contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

78.    Plaintiff is informed and believes, and thereupon alleges, that since at least December 19, 2002, Defendant has been discharging polluted storm water from the Facility directly to storm drains that flow into the San Leandro Bay and the San Francisco Bay, in violation of the Discharge Prohibition A(2) of  the General Permit.

79.    During every rain event, rainwater flows freely over exposed metal products, production materials, waste products, and other accumulated pollutants at the Facility, becoming contaminated with these pollutants. The rainwater then flows untreated from the Facility into one or more adjacent storm water drains.  This contaminated storm water flows through the drains into nearby San Leandro Bay, a part of the San Francisco Bay.

80.    Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing pollution and contamination of the waters of the United States in violation of Discharge Prohibition A(2) of the General Permit.

81.    Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of Receiving Water Limitation C(1) of the General Permit.

82.    Plaintiff is informed and believes, and thereupon alleges, that these discharges of

COMPLAINT

1    contaminated storm water are contributing to the violation of the applicable water quality

2    standards in the Statewide Water Quality Control Plan and/or the applicable Regional Board's

3    Basin Plan in violation of Receiving Water Limitation C(2) of the General Permit.

4         83.    Every day since at least December 16, 2002, that Defendant has discharged and

5    continues to discharge polluted storm water from the Facility in violation of the General Permit

6    is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  These

7    violations are ongoing and continuous.

8    **FIFTH CAUSE OF ACTION**
     **False Certification of Compliance In Annual Report**

9    **(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

10        84.    Plaintiff realleges and incorporate Paragraphs 1-83, as if fully set forth herein.

11        85.    Defendant has falsely certified compliance with the General Permit in each of

12   the annual reports submitted to the Regional Board since at least June 2001.

13        86.    Each day since at least June 30, 2001 that Defendant has falsely certified

14   compliance with the General Permit is a separate and distinct violation of the General Permit

15   and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  Defendant continues to be in violation of

16   the General Permit's certification requirement each day that it maintains its false certification

17   of its compliance with the General Permit.

18   **VII.   RELIEF REQUESTED**

19        Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

20        a.   Declare Defendant to have violated and to be in violation of the Act as

21   alleged herein;

22        b.   Enjoin Defendant from discharging polluted storm water from the Facility

23   unless authorized by the Permit;

24        c.   Enjoin Defendant from further violating the substantive and procedural

25   requirements of the Permit;

26        d.   Order Defendant to immediately implement storm water pollution control

27   and treatment technologies and measures that are equivalent to BAT or BCT and prevent

28   pollutants in the Facility's storm water from contributing to violations of any water quality

COMPLAINT

1    standards;

2         e.  Order Defendant to comply with the Permit's monitoring and reporting

3    requirements, including ordering supplemental monitoring to compensate for past monitoring

4    violations;

5         f.  Order Defendant to prepare a SWPPP consistent with the Permit's

6    requirements and implement procedures to regularly review and update the SWPPP;

7         g.  Order Defendant to provide Plaintiff with reports documenting the quality

8    and quantity of their discharges to waters of the United States and their efforts to comply with

9    the Act and the Court's orders;

10        h.  Order Defendant to pay civil penalties of $27,500 per day per violation for

11   all violations occurring before March 15, 2004, and $32,500 per day per violation for all

12   violations occurring after March 15, 2004, for each violation of the Act pursuant to Sections

13   309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1 - 19.4;

14        i.  Order Defendant to take appropriate actions to restore the quality of waters

15   impaired or adversely affected by their activities;

16        j.  Award Plaintiff's costs (including reasonable investigative, attorney, witness,

17   compliance oversight, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

18        k.  Award any such other and further relief as this Court may deem appropriate.

19

20   Dated: July 9, 2007            Respectfully submitted,

21                                 LAW OFFICE OF MICHAEL R. LOZEAU

22

23   By:  _____
                                 Douglas J. Chermak
24                               Attorney for Plaintiff
                                 CALIFORNIA SPORTFISHING PROTECTION
25                               ALLIANCE

26

27

28

COMPLAINT
                              20

# EXHIBIT A



**California Sportfishing Protection Alliance**
*"An Advocate for Fisheries, Habitat and Water Quality"*
**3536 Rainier Avenue, Stockton, CA 95204**
**Tel: 209-464-5067, Fax: 209-464-1028, E: deltakeep@aol.com**

VIA CERTIFIED MAIL
RETURN RECEIPT REQUESTED

March 14, 2007

Paul Forkash
Owner, Operator, and Registered Agent
Andy Smilovitz, Supervisor
Aaron Metals Company
750 105th Avenue
Oakland, CA 94603

**Re:    Notice of Violations and Intent to File Suit Under the Federal Water
         Pollution Control Act**

Dear Sirs:

I am writing on behalf of the California Sportfishing Protection Alliance ("CSPA") in regard to violations of the Clean Water Act ("Act") that CSPA believes are occurring at Aaron Metals Company  ("Facility") located at 750 105th Avenue in Oakland, California.  CSPA is a non-profit public benefit corporation dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of the San Francisco Bay, San Leandro Bay, and other California waters. This letter is being sent to you as the responsible owners, officers, or operators of Aaron Metals (all recipients are hereinafter collectively referred to as "Aaron Metals").

This letter addresses Aaron Metals' unlawful discharge of pollutants from the Facility through the Oakland municipal storm sewer system into San Francisco Bay and San Leandro Bay.  The Facility is discharging storm water pursuant to National Pollutant Discharge Elimination System ("NPDES") Permit No. CA S000001, California Regional Water Quality Control Board, San Francisco Bay Region ("Regional Board") Order No. 92-12-DWQ as amended by Order No. 97-03-DWQ (hereinafter "General Permit").  The WDID identification number for the Facility listed on documents submitted to the California Regional Water Quality Control Board ("the Regional Board") is 201S003753.  The Facility is engaged in ongoing violations of the substantive and procedural requirements of the General Permit.

Section 505(b) of the Clean Water Act requires a citizen to give notice of intent to file suit sixty (60) days prior to the initiation of a civil action under Section 505(a) of the Act (33 U.S.C. § 1365(a)). Notice must be given to the alleged violator, the U.S. Environmental Protection Agency, and the State in which the violations occur.

Paul Forkash
Andy Smilovitz
Aaron Metals Co.
March 1, 2007
Page 2

As required by the Clean Water Act, this Notice of Violation and Intent to File Suit provides notice of the violations that have occurred, and continue to occur, at the Facility. Consequently, Aaron Metals is hereby placed on formal notice by CSPA that, after the expiration of sixty days from the date of this Notice of Violation and Intent to Sue, CSPA intends to file suit in federal court against Aaron Metals, Paul Forkash, and Andy Smilovitz under Section 505(a) of the Clean Water Act (33 U.S.C. § 1365(a)), for violations of the Clean Water Act and the Order.  These violations are described more extensively below.

## I.    Background.

On May 13, 1997 Aaron Metals filed its Notice of Intent to Comply with the Terms of the General Permit to Discharge Storm Water Associated with Industrial Activity ("NOI"). Aaron Metals certifies that the Facility is classified under SIC code 5093 ("processing, reclaiming, and wholesale distribution of scrap and waste materials").  The Facility collects and discharges storm water from its two-acre industrial site into storm drain outlets at its north and south recycling yards.  Storm water discharged by Aaron Metals to those drains is then discharged to San Leandro Bay and San Francisco Bay.  The San Francisco Regional Water Quality Control Board (the "Regional Board" or "Board") has identified waters of San Francisco Bay and San Leandro Bay as failing to meet applicable water quality standards for dissolved oxygen, unknown toxicity, electrical conductivity, pesticides and mercury.  See http://www.swrcb.ca.gov/tmdl/ docs/ 2002reg5303dlist.pdf.

The Regional Board has identified beneficial uses of the Bay region's waters and established water quality standards for the San Francisco Bay, including the San Leandro Bay and the Oakland Estuary, in the "Water Quality Control Plan for the San Francisco Bay Basin," generally referred to as the Basin Plan. See http://www.swrcb.ca.gov/rwqcb2/basinplan.htm. The beneficial uses of these waters include among others contact and non-contact recreation, fish migration, endangered and threatened species habitat, shellfish harvesting, and fish spawning. The non-contact recreation use is defined as "[u]ses of water for recreational activities involving proximity to water, but not normally involving contact with water where water ingestion is reasonably possible. These uses include, but are not limited to, picnicking, sunbathing, hiking, beachcombing, camping, boating, tide pool and marine life study, hunting, sightseeing, or aesthetic enjoyment in conjunction with the above activities.  Water quality considerations relevant to noncontact water recreation, such as hiking, camping, or boating, and those activities related to tide pool or other nature studies require protection of habitats and aesthetic features." Basin Plan at 2.1.16.  Visible pollution, including visible sheens and cloudy or muddy water from industrial areas, impairs people's use of the Bay for contact and noncontact water recreation.  For example, pollutant discharges of high suspended solids and other pollutants in industrial storm water contribute to the existing impairments of San Leandro Bay, including high electrical conductivity and low dissolved oxygen.

Notice of Violation and Intent to File Suit

Paul Forkash
Andy Smilovitz
Aaron Metals Co.
March 14, 2007
Page 3

The Basin Plan includes a narrative toxicity standard which states that "[a]ll waters shall be maintained free of toxic substances in concentrations that produce detrimental physiological responses in human, plant, animal, or aquatic life" and "… that are lethal to or that produce other detrimental responses in aquatic organisms."  *See* http://www.swrcb.ca.gov/rwqcb2/ basinplan/web/BP_CH3.html.  The Basin Plan includes a narrative oil and grease standard which states that "[w]aters shall not contain oils, greases, waxes, or other materials in concentrations that cause nuisance, result in a visible film or coating on the surface of the water or on objects in the water, or otherwise adversely affect beneficial uses."  The Basin Plan provides that "[w]aters shall not contain suspended material in concentrations that cause nuisance or adversely affect beneficial uses."  *See id.*  The Basin Plan establishes Marine Water Quality Objectives for zinc of .081 mg/l (4-day average) and .090 mg/l (1-hour average); and lead of .0081 mg/L (4 day average) and .21 mg/L (1hour average).  *See* http://www.swrcb.ca.gov/rwqcb2/ basinplan/web/tab_3-3.html.  EPA has adopted a numeric water quality standard for copper of .0031 mg/L (4-day average) and .0048 mg/L (1-hour average).  65 Fed.Reg. 31712 (May 18, 2000).

The U.S. Environmental Protection Agency ("EPA") has published benchmark levels as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite best available technology economically achievable ("BAT") and best conventional pollutant control technology ("BCT").  The following benchmarks have been established for pollutants discharged by Aaron Metals: pH – 6.0-9.0 units; total suspended solids ("TSS") – 100 mg/L, chemical oxygen demand ("COD") – 120 mg/L, aluminum – .75 mg/L,  zinc – 0.117 mg/L, iron – 1 mg/L, copper – .0636 mg/L, lead – .0816 mg/L.  The State Water Quality Control Board also recently proposed adding a benchmark level to the General Permit for specific conductance (200 µmho/cm).

## II.    Alleged Violations of the NPDES Permit.

### A.    *Discharges in Violation of the Permit.*

Aaron Metals has violated and continues to violate the terms and conditions of the General Industrial Storm Water Permit.  Section 402(p) of the Act prohibits the discharge of storm water associated with industrial activities, except as permitted under an NPDES permit (33 U.S.C. § 1342) such as the General Permit.  The General Permit prohibits any discharges of storm water associated with industrial activities that have not been subjected to BAT or BCT. Effluent Limitation B(3) of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.  BAT and BCT include both nonstructural and structural measures.  General Permit, Section A(8).  Conventional pollutants are TSS, oil and grease ("O&G"), pH, biochemical oxygen demand ("BOD"), and fecal coliform. 40 C.F.R. § 401.16.  All other pollutants are either toxic or nonconventional.  *Id.*;  40 C.F.R. § 401.15.

Paul Forkash
Andy Smilovitz
Aaron Metals Co.
March 14, 2007
Page 4

In addition, Discharge Prohibition A(1) of the General Permit prohibits the discharge of materials other than storm water (defined as non-storm water discharges) that discharge either directly or indirectly to waters of the United States. Discharge Prohibition A(2) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.

Receiving Water Limitation C(1) of the General Industrial Storm Water Permit prohibits storm water discharges and authorized non-storm water discharges to surface or groundwater that adversely impact human health or the environment. Receiving Water Limitation C(2) of the General Permit also prohibits storm water discharges and authorized non-storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan. The Board has identified sediments in the San Leandro Bay as contaminated by zinc to an extent that is adversely affecting beneficial uses in those areas. *See* http://www.swrcb.ca.gov/tmdl/docs/ 2002reg2303dlist.pdf

Aaron Metals has discharged and continues to discharge storm water with unacceptable levels of total suspended solids, specific conductivity, aluminum, copper, cadmium, iron, and other pollutants in violation of the General Permit. Aaron Metals' sampling and analysis results reported to the Regional Board confirm discharges of specific pollutants and materials other than storm water in violation of the Permit provisions listed above. Self-monitoring reports under the Permit are deemed "conclusive evidence of an exceedance of a permit limitation." *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988).

The following discharges of pollutants from the Facility have violated Discharge Prohibitions A(1) and A(2) and Receiving Water Limitations C(1) and C(2) and are evidence of ongoing violations of Effluent Limitation B(3) of the General Industrial Storm Water Permit.

| Date | Parameter | Concentration | Objective | Benchmark | Location |
|------|-----------|---------------|-----------|-----------|----------|
| 1/30/2006 | Iron | 5.1 mg/l | | 1.0 mg/l | North Yd. |
| 1/30/2006 | Copper | 0.88 mg/l | .0048 mg/L (1-hour avg.) | 0.0636 | North Yd. |
| 1/30/2006 | Aluminum | 3.6 mg/l | Narrative | 0.75 mg/l | North Yd. |
| 1/30/2006 | TSS | 134 mg/l | Narrative | 100 mg/l | North Yd. |
| 11/29/2005 | Copper | 0.15 mg/l | .0048 mg/L (1-hour avg.) | .0636 mg/l | North Yd. |
| 3/29/2005 | Aluminum | 5.6 mg/l | Narrative | 0.75 mg/l | North Yd. |
| 3/29/2005 | TSS | 240 mg/L | Narrative | 100 mg/L | North Yd. |
| 12/27/2004 | Aluminum | 3.1 mg/l | Narrative | 0.75 mg/l | South Yd. |
| 12/27/2004 | O&G | 17 mg/l | Narrative | 15 mg/l | South Yd. |
| 2/25/2004 | TSS | 410 mg/l | Narrative | 100 mg/l | North Yd. |

Paul Forkash
Andy Smilovitz
Aaron Metals Co.
March 14, 2007
Page 5

| 2/25/2004 | Aluminum | 10 mg/l | Narrative | 0.75 mg/l | North Yd. |
|-----------|----------|---------|-----------|-----------|-----------|
| 2/25/2004 | TSS | 500 mg/l | Narrative | 100 mg/l | South Yd. |
| 2/25/2004 | Aluminum | 16 mg/l | Narrative | 0.75 mg/l | South Yd. |
| 2/25/2004 | O&G | 23 mg/l | Narrative | 15 mg/l | North Yd. |
| 2/25/2004 | O&G | 24 mg/l | Narrative | 15 mg/l | South Yd. |
| 2/2/2004 | Aluminum | 4.5 mg/l | Narrative | 0.75 mg/l | North Yd. |
| 2/2/2004 | TSS | 200 mg/l | Narrative | 100 mg/l | North Yd. |
| 2/2/2004 | Aluminum | 8.0 mg/l | Narrative | 0.75 mg/l | South Yd. |
| 2/2/2004 | TSS | 280 mg/l | Narrative | 100 mg/l | South Yd. |
| 2/2/2004 | O&G | 19 mg/l | Narrative | 15 mg/l | North Yd. |
| 2/2/2004 | O&G | 24 mg/l | Narrative | 15 mg/l | South Yd. |
| 4/12/2003 | Aluminum | 5.1 mg/l | Narrative | 0.75 mg/l | North Yd. |
| 4/12/2003 | TSS | 200 mg/l | Narrative | 100 mg/l | North Yd. |
| 4/12/2003 | Aluminum | 2.3 mg/l | Narrative | 0.75 mg/l | South Yd. |
| 12/16/2002 | Aluminum | 14 mg/l | Narrative | 0.75 mg/l | North Yd. |
| 12/16/2002 | TSS | 490 mg/l | Narrative | 100 mg/l | North Yd. |
| 12/16/2002 | Specific Conductivity | 270 μmho/cm | Narrative | 200 μmho/cm (proposed) | North Yd. |
| 12/16/2002 | Aluminum | 41 mg/l | Narrative | 0.75 mg/l | South Yd. |
| 12/16/2002 | TSS | 790 mg/l | Narrative | 0.75 mg/l | South Yd. |
| 12/16/2002 | Specific Conductivity | 400 μmho/cm | Narrative | 200 μmho/cm (proposed) | South Yd. |
| 12/16/2002 | O&G | 24 mg/l | Narrative | 15 mg/l | North Yd. |
| 12/16/2002 | O&G | 76 mg/l | Narrative | 15 mg/l | South Yd. |

CSPA's investigation, including its review of Aaron Metals' analytical results documenting pollutant levels in the Facility's storm water discharges well in excess of EPA's benchmark values and the State Board's proposed benchmark for electrical conductivity, indicates that Aaron Metals has not implemented BAT and BCT at the Facility for its discharges of TSS, specific conductivity, aluminum, copper, iron and other pollutants, in violation of Effluent Limitation B(3) of the General Permit. Aaron Metals was required to have implemented BAT and BCT by no later than October 1, 1992. Thus, Aaron Metals is discharging polluted storm water associated with its industrial operations without having implemented BAT and BCT. In addition, the above numbers indicate that the facility is discharging polluted storm water in violation of Discharge Prohibitions A(1) and A(2) and Receiving Water Limitations C(1) and C(2) of the General Permit. CSPA alleges that such violations also have occurred and will occur on other rain dates, including every significant rain event that has occurred since March 14, 2002, and that will occur at the Facility subsequent to the date of this Notice of Violation and Intent to File Suit. Attachment A, attached hereto, sets forth each of the specific rain dates on which CSPA alleges that Aaron Metals has discharged storm water containing impermissible

Paul Forkash
Andy Smilovitz
Aaron Metals Co.
March 14, 2007
Page 6

levels of TSS, aluminum, copper, iron, and O&G in violation of Effluent Limitation B(3), Discharge Prohibitions A(1) and A(2), and Receiving Water Limitations C(1) and C(2) of the General Permit.

These unlawful discharges from the Facility are ongoing. Each discharge of storm water containing any of these pollutants constitutes a separate violation of the General Industrial Storm Water Permit and the Act. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Aaron Metals is subject to penalties for violations of the General Permit and the Act since March 14, 2002.

### B.    Failure to Sample and Analyze for Mandatory Parameters

With some limited adjustments, facilities covered by the General Permit must sample two storm events per season from each of their storm water discharge locations. General Permit, Section B(5)(a). Collected samples must be analyzed for TSS, pH, specific conductance, and either total organic carbon or O&G. *Id*. at Section B(5)(c)(i). Facilities also must analyze their storm water samples for "[t]oxic chemicals and other pollutants that are likely to be present in storm water discharges in significant quantities. *Id*. at Section B(5)(c)(ii). Certain SIC Codes also must analyze for additional specified parameters. *Id*. at Section B(5)(c)(iii); *id.*, Table D. Facilities within SIC Code 5093, including Aaron Metals, must analyze each of its storm water samples for COD, iron, lead, zinc, and aluminum. *Id.*, Table D (Sector N). CSPA's review of Aaron Metal's monitoring data indicates that you have failed to analyze for the following required parameters in samples taken on the following dates at the identified storm water discharge locations at the Facility:

| Date | Parameter | Concentration | Objective | Benchmark | Location |
|------|-----------|---------------|-----------|-----------|----------|
| 1/30/2006 | Lead | No analysis | | .0816 mg/l | North Yd. |
| 1/30/2006 | Zinc | No analysis | | 0.117 mg/l | North Yd. |
| 1/30/2006 | COD | No analysis | | 120 mg/l | North Yd. |
| 1/30/2006 | Lead | No analysis | | .0816 mg/l | South Yd. |
| 1/30/2006 | Zinc | No analysis | | 0.117 mg/l | South Yd. |
| 1/30/2006 | COD | No analysis | | 120 mg/l | South Yd. |
| 11/29/2005 | Lead | No analysis | | .0816 mg/l | North Yd. |
| 11/29/2005 | Zinc | No analysis | | 0.117 mg/l | North Yd. |
| 11/29/2005 | COD | No analysis | | 120 mg/l | North Yd. |
| 11/29/2005 | Lead | No analysis | | .0816 mg/l | South Yd. |
| 11/29/2005 | Zinc | No analysis | | 0.117 mg/l | South Yd. |
| 11/29/2005 | COD | No analysis | | 120 mg/l | South Yd. |
| 3/29/2005 | Iron | No analysis | | 1.0 mg/l | North Yd. |
| 3/29/2005 | Lead | No analysis | | .0816 mg/l | North Yd. |
| 3/29/2005 | Zinc | No analysis | | 0.117 mg/l | North Yd. |
| 3/29/2005 | Copper | No analysis | | .0636 mg/l | North Yd. |

Notice of Violation and Intent to File Suit

Paul Forkash
Andy Smilovitz
Aaron Metals Co.
March 14, 2007
Page 7

| | | | | | |
|---|---|---|---|---|---|
| 3/29/2005 | COD | No analysis | | 120 mg/l | North Yd. |
| 3/29/2005 | Iron | No analysis | | 1.0 mg/l | South Yd. |
| 3/29/2005 | Lead | No analysis | | .0816 mg/l | South Yd. |
| 3/29/2005 | Zinc | No analysis | | 0.117 mg/l | South Yd. |
| 3/29/2005 | Copper | No analysis | | .0636 mg/l | South Yd. |
| 3/29/2005 | COD | No analysis | | 120 mg/l | South Yd. |
| 12/27/2004 | Iron | No analysis | | 1.0 mg/l | North Yd. |
| 12/27/2004 | Lead | No analysis | | .0816 mg/l | North Yd. |
| 12/27/2004 | Zinc | No analysis | | 0.117 mg/l | North Yd. |
| 12/27/2004 | Copper | No analysis | | .0636 mg/l | North Yd. |
| 12/27/2004 | COD | No analysis | | 120 mg/l | North Yd. |
| 12/27/2004 | Iron | No analysis | | 1.0 mg/l | South Yd. |
| 12/27/2004 | Lead | No analysis | | .0816 mg/l | South Yd. |
| 12/27/2004 | Zinc | No analysis | | 0.117 mg/l | South Yd. |
| 12/27/2004 | Copper | No analysis | | .0636 mg/l | South Yd. |
| 12/27/2004 | COD | No analysis | | 120 mg/l | South Yd. |
| 2/25/2004 | Iron | No analysis | | 1.0 mg/l | North Yd. |
| 2/25/2004 | Lead | No analysis | | .0816 mg/l | North Yd. |
| 2/25/2004 | Zinc | No analysis | | 0.117 mg/l | North Yd. |
| 2/25/2004 | Copper | No analysis | | .0636 mg/l | North Yd. |
| 2/25/2004 | COD | No analysis | | 120 mg/l | North Yd. |
| 2/25/2004 | Iron | No analysis | | 1.0 mg/l | South Yd. |
| 2/25/2004 | Lead | No analysis | | .0816 mg/l | South Yd. |
| 2/25/2004 | Zinc | No analysis | | 0.117 mg/l | South Yd. |
| 2/25/2004 | Copper | No analysis | | .0636 mg/l | South Yd. |
| 2/25/2004 | COD | No analysis | | 120 mg/l | South Yd. |
| 2/2/2004 | Iron | No analysis | | 1.0 mg/l | North Yd. |
| 2/2/2004 | Lead | No analysis | | .0816 mg/l | North Yd. |
| 2/2/2004 | Zinc | No analysis | | 0.117 mg/l | North Yd. |
| 2/2/2004 | Copper | No analysis | | .0636 mg/l | North Yd. |
| 2/2/2004 | COD | No analysis | | 120 mg/l | North Yd. |
| 2/2/2004 | Iron | No analysis | | 1.0 mg/l | South Yd. |
| 2/2/2004 | Lead | No analysis | | .0816 mg/l | South Yd. |
| 2/2/2004 | Zinc | No analysis | | 0.117 mg/l | South Yd. |
| 2/2/2004 | Copper | No analysis | | .0636 mg/l | South Yd. |
| 2/2/2004 | COD | No analysis | | 120 mg/l | South Yd. |
| 4/12/2003 | Iron | No analysis | | 1.0 mg/l | North Yd. |
| 4/12/2003 | Lead | No analysis | | .0816 mg/l | North Yd. |
| 4/12/2003 | Zinc | No analysis | | 0.117 mg/l | North Yd. |
| 4/12/2003 | Copper | No analysis | | .0636 mg/l | North Yd. |
| 4/12/2003 | COD | No analysis | | 120 mg/l | North Yd. |

Paul Forkash
Andy Smilovitz
Aaron Metals Co.
March 14, 2007
Page 8

| 4/12/2003 | Iron | No analysis | | 1.0 mg/l | South Yd. |
|---|---|---|---|---|---|
| 4/12/2003 | Lead | No analysis | | .0816 mg/l | South Yd. |
| 4/12/2003 | Zinc | No analysis | | 0.117 mg/l | South Yd. |
| 4/12/2003 | Copper | No analysis | | .0636 mg/l | South Yd. |
| 4/12/2003 | COD | No analysis | | 120 mg/l | South Yd. |
| 12/16/2002 | Iron | No analysis | | 1.0 mg/l | North Yd. |
| 12/16/2002 | Lead | No analysis | | .0816 mg/l | North Yd. |
| 12/16/2002 | Zinc | No analysis | | 0.117 mg/l | North Yd. |
| 12/16/2002 | Copper | No analysis | | .0636 mg/l | North Yd. |
| 12/16/2002 | COD | No analysis | | 120 mg/l | North Yd. |
| 12/16/2002 | Iron | No analysis | | 1.0 mg/l | South Yd. |
| 12/16/2002 | Lead | No analysis | | .0816 mg/l | South Yd. |
| 12/16/2002 | Zinc | No analysis | | 0.117 mg/l | South Yd. |
| 12/16/2002 | Copper | No analysis | | .0636 mg/l | South Yd. |
| 12/16/2002 | COD | No analysis | | 120 mg/l | South Yd. |

Each of the above listed failures to analyze for specific required parameters is a violation of General Permit, Section B(5)(iii). These violations are ongoing. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Aaron Metals is subject to penalties for violations of the General Permit and the Act since March 14, 2002.

**C.      Failure to Develop and Implement an Adequate Storm Water Pollution Prevention Plan.**

Section A and Provision E(2) of the General Industrial Storm Water Permit require dischargers of storm water associated with industrial activity to develop, implement, and update an adequate storm water pollution prevention plan ("SWPPP") no later than October 1, 1992. Section A(1) and Provision E(2) requires dischargers who submitted an NOI pursuant to the General Permit to continue following their existing SWPPP and implement any necessary revisions to their SWPPP in a timely manner, but in any case, no later than August 1, 1997.

The SWPPP must, among other requirements, identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm and non-storm water discharges from the facility and identify and implement site-specific best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges (General Permit, Section A(2)). The SWPPP must include BMPs that achieve BAT and BCT (Effluent Limitation B(3)). The SWPPP must include: a description of individuals and their responsibilities for developing and implementing the SWPPP (General Permit, Section A(3)); a site map showing the facility boundaries, storm water drainage areas with flow pattern and nearby water bodies, the location of the storm water collection, conveyance and discharge system, structural control measures, impervious areas,

Notice of Violation and Intent to File Suit

Paul Forkash
Andy Smilovitz
Aaron Metals Co.
March 14, 2007
Page 9

areas of actual and potential pollutant contact, and areas of industrial activity (General Permit, Section A(4)); a list of significant materials handled and stored at the site (General Permit, Section A(5)); a description of potential pollutant sources including industrial processes, material handling and storage areas, dust and particulate generating activities, a description of significant spills and leaks, a list of all non-storm water discharges and their sources, and a description of locations where soil erosion may occur (General Permit, Section A(6)).

The SWPPP also must include an assessment of potential pollutant sources at the Facility and a description of the BMPs to be implemented at the Facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges, including structural BMPs where non-structural BMPs are not effective (General Permit, Section A(7), (8)).  The SWPPP must be evaluated to ensure effectiveness and must be revised where necessary (General Permit, Section A(9),(10)).

CSPA's investigation of the conditions at the Facility as well as Aaron Metals' Annual Reports indicate that Aaron Metals has been operating with an inadequately developed or implemented SWPPP in violation of the requirements set forth above.  Aaron Metals has failed to evaluate the effectiveness of its BMPs and to revise its SWPPP as necessary.  Aaron Metals has been in continuous violation of Section A and Provision E(2) of the General Permit every day since March 14, 2002 at the very latest, and will continue to be in violation every day that Aaron Metals fails to develop and implement an effective SWPPP.  Aaron Metals is subject to penalties for violations of the Order and the Act occurring since March 14, 2002.

> ### D.    Failure to File True and Correct Annual Reports.

Section B(14) of the General Industrial Storm Water Permit requires dischargers to submit an Annual Report by July 1st of each year to the executive officer of the relevant Regional Board.  The Annual Report must be signed and certified by an appropriate corporate officer.  General Permit, Sections B(14), C(9), (10).  Section A(9)(d) of the General Industrial Storm Water Permit requires the discharger to include in their annual report an evaluation of their storm water controls, including certifying compliance with the General Industrial Storm Water Permit.  *See also* General Permit, Sections C(9) and (10) and B(14).

For the last five years, Aaron Metals and its agent, Paul Forkash, inaccurately certified in their Annual Reports that the facility was in compliance with the General Permit.  Consequently, Aaron Metals has violated Sections A(9)(d), B(14) and C(9) & (10) of the General Industrial Storm Water Permit every time Aaron Metals failed to submit a complete or correct report and every time Aaron Metals or its agents falsely purported to comply with the Act.  Aaron Metals is subject to penalties for violations of Section (C) of the General Industrial Storm Water Permit and the Act occurring since June 1, 2002.

Paul Forkash
Andy Smilovitz
Aaron Metals Co.
March 14, 2007
Page 10

## IV.    Persons Responsible for the Violations.

CSPA puts Aaron Metals, Paul Forkash, and Andy Smilovitz on notice that they are the persons responsible for the violations described above.  If additional persons are subsequently identified as also being responsible for the violations set forth above, CSPA puts Aaron Metals, Paul Forkash, and Andy Smilovitz on notice that it intends to include those persons in this action.

## V.    Name and Address of Noticing Party.

Our name, address and telephone number is as follows:

Bill Jennings, Executive Director;
California Sportfishing Protection Alliance,
3536 Rainier Avenue,
Stockton, CA 95204
Tel. (209) 464-5067

## VI.    Counsel.

CSPA has retained legal counsel to represent it in this matter.  Please direct all communications to:

Michael R. Lozeau                             Andrew L. Packard
Law Office of Michael R. Lozeau              Law Offices of Andrew L. Packard
1516 Oak Street, Suite 216                   319 Pleasant Street
Alameda, California 94501                    Petaluma, California 94952
Tel. (510) 749-9102                          Tel. (707) 763-7227
mrlozeau@lozeaulaw.com                       andrew@packardlawoffices.com

## VII.    Penalties.

Pursuant to Section 309(d) of the Act (33 U.S.C. § 1319(d)) and the Adjustment of Civil Monetary Penalties for Inflation (40 C.F.R. § 19.4) each separate violation of the Act subjects Aaron Metals to a penalty of up to $32,500 per day per violation for all violations occurring during the period commencing five years prior to the date of this Notice of Violations and Intent to File Suit.  In addition to civil penalties, CSPA will seek injunctive relief preventing further violations of the Act pursuant to Sections 505(a) and (d) (33 U.S.C. §1365(a) and (d)) and such other relief as permitted by law.  Lastly, Section 505(d) of the Act (33 U.S.C. § 1365(d)), permits prevailing parties to recover costs and fees, including attorneys' fees.

Paul Forkash
Andy Smilovitz
Aaron Metals Co.
March 14, 2007
Page 11

CSPA believes this Notice of Violations and Intent to File Suit sufficiently states grounds for filing suit.  We intend to file a citizen suit under Section 505(a) of the Act against Aaron Metals and its agents for the above-referenced violations upon the expiration of the 60-day notice period.  However, during the 60-day notice period, we would be willing to discuss effective remedies for the violations noted in this letter.  If you wish to pursue such discussions in the absence of litigation, we suggest that you initiate those discussions within the next 20 days so that they may be completed before the end of the 60-day notice period.  We do not intend to delay the filing of a complaint in federal court if discussions are continuing when that period ends.


Sincerely,


Bill Jennings, Executive Director
California Sportfishing Protection Alliance

## <u>SERVICE LIST</u>

Steve Johnson, Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Tom Howard, Acting Executive Director
State Water Resources Control Board
1001 I Street Sacramento, CA 95814
P.O. Box 100
Sacramento, CA 95812-0100

Alberto Gonzalez, U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Wayne Nastri, Administrator
U.S. EPA – Region 9
75 Hawthorne Street
San Francisco, CA, 94105

Bruce H. Wolfe, Executive Officer II
San Francisco Bay Regional Water Quality Control Board
1515 Clay Street, Suite 1400
Oakland, CA 94612

## ATTACHMENT A
### Rain Dates, Aaron Metals, Oakland, California

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | February | 19 | 2003 | December | 02 | 2003 |
| March | 17 | 2002 | February | 25 | 2003 | December | 04 | 2003 |
| March | 22 | 2002 | February | 26 | 2003 | December | 05 | 2003 |
| March | 23 | 2002 | March | 13 | 2003 | December | 06 | 2003 |
| April | 09 | 2002 | March | 14 | 2003 | December | 07 | 2003 |
| April | 16 | 2002 | March | 15 | 2003 | December | 09 | 2003 |
| April | 29 | 2002 | March | 16 | 2003 | December | 10 | 2003 |
| May | 19 | 2002 | March | 17 | 2003 | December | 12 | 2003 |
| May | 20 | 2002 | March | 18 | 2003 | December | 13 | 2003 |
| May | 21 | 2002 | March | 19 | 2003 | December | 14 | 2003 |
| June | 21 | 2002 | March | 20 | 2003 | December | 19 | 2003 |
| June | 22 | 2002 | March | 23 | 2003 | December | 20 | 2003 |
| August | 02 | 2002 | March | 26 | 2003 | December | 21 | 2003 |
| November | 07 | 2002 | April | 01 | 2003 | December | 23 | 2003 |
| November | 08 | 2002 | April | 02 | 2003 | December | 24 | 2003 |
| November | 10 | 2002 | April | 03 | 2003 | December | 25 | 2003 |
| December | 06 | 2002 | April | 04 | 2003 | December | 28 | 2003 |
| December | 09 | 2002 | April | 12 | 2003 | December | 29 | 2003 |
| December | 10 | 2002 | April | 13 | 2003 | January | 01 | 2004 |
| December | 13 | 2002 | April | 14 | 2003 | January | 02 | 2004 |
| December | 14 | 2002 | April | 16 | 2003 | January | 06 | 2004 |
| December | 15 | 2002 | April | 21 | 2003 | January | 08 | 2004 |
| December | 16 | 2002 | April | 22 | 2003 | January | 09 | 2004 |
| December | 17 | 2002 | April | 24 | 2003 | January | 14 | 2004 |
| December | 18 | 2002 | April | 25 | 2003 | January | 23 | 2004 |
| December | 19 | 2002 | April | 27 | 2003 | January | 24 | 2004 |
| December | 20 | 2002 | April | 28 | 2003 | January | 26 | 2004 |
| December | 21 | 2002 | April | 29 | 2003 | January | 27 | 2004 |
| December | 25 | 2002 | May | 02 | 2003 | January | 30 | 2004 |
| December | 26 | 2002 | May | 03 | 2003 | February | 01 | 2004 |
| December | 27 | 2002 | May | 06 | 2003 | February | 02 | 2004 |
| December | 28 | 2002 | May | 07 | 2003 | February | 03 | 2004 |
| December | 29 | 2002 | May | 08 | 2003 | February | 06 | 2004 |
| December | 30 | 2002 | May | 30 | 2003 | February | 13 | 2004 |
| December | 31 | 2002 | July | 24 | 2003 | February | 15 | 2004 |
| January | 09 | 2003 | September | 03 | 2003 | February | 16 | 2004 |
| January | 10 | 2003 | November | 02 | 2003 | February | 17 | 2004 |
| January | 12 | 2003 | November | 03 | 2003 | February | 18 | 2004 |
| January | 20 | 2003 | November | 06 | 2003 | February | 20 | 2004 |
| January | 21 | 2003 | November | 07 | 2003 | February | 21 | 2004 |
| January | 22 | 2003 | November | 08 | 2003 | February | 22 | 2004 |
| January | 23 | 2003 | November | 09 | 2003 | February | 24 | 2004 |
| February | 11 | 2003 | November | 14 | 2003 | February | 25 | 2004 |
| February | 12 | 2003 | November | 15 | 2003 | February | 26 | 2004 |
| February | 13 | 2003 | November | 17 | 2003 | February | 27 | 2004 |
| February | 15 | 2003 | November | 30 | 2003 | March | 01 | 2004 |
| February | 16 | 2003 | December | 01 | 2003 | March | 25 | 2004 |

## ATTACHMENT A

### Rain Dates, Aaron Metals, Oakland, California

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| March | 27 | 2004 | January | 18 | 2005 | May | 04 | 2005 |
| April | 18 | 2004 | January | 19 | 2005 | May | 05 | 2005 |
| April | 19 | 2004 | January | 20 | 2005 | May | 08 | 2005 |
| April | 20 | 2004 | January | 21 | 2005 | May | 09 | 2005 |
| April | 21 | 2004 | January | 22 | 2005 | May | 18 | 2005 |
| May | 28 | 2004 | January | 23 | 2005 | May | 19 | 2005 |
| August | 23 | 2004 | January | 24 | 2005 | June | 8 | 2005 |
| August | 24 | 2004 | January | 25 | 2005 | June | 09 | 2005 |
| September | 19 | 2004 | January | 26 | 2005 | June | 16 | 2005 |
| October | 17 | 2004 | January | 27 | 2005 | June | 17 | 2005 |
| October | 19 | 2004 | January | 28 | 2005 | June | 18 | 2005 |
| October | 20 | 2004 | February | 07 | 2005 | October | 14 | 2005 |
| October | 23 | 2004 | February | 11 | 2005 | October | 15 | 2005 |
| October | 25 | 2004 | February | 14 | 2005 | October | 26 | 2005 |
| October | 26 | 2004 | February | 15 | 2005 | October | 29 | 2005 |
| November | 03 | 2004 | February | 16 | 2005 | November | 03 | 2005 |
| November | 04 | 2004 | February | 17 | 2005 | November | 04 | 2005 |
| November | 09 | 2004 | February | 18 | 2005 | November | 07 | 2005 |
| November | 10 | 2004 | February | 19 | 2005 | November | 08 | 2005 |
| November | 11 | 2004 | February | 20 | 2005 | November | 09 | 2005 |
| November | 13 | 2004 | February | 21 | 2005 | November | 25 | 2005 |
| November | 27 | 2004 | February | 26 | 2005 | November | 28 | 2005 |
| December | 06 | 2004 | February | 27 | 2005 | November | 29 | 2005 |
| December | 07 | 2004 | February | 28 | 2005 | December | 01 | 2005 |
| December | 08 | 2004 | March | 01 | 2005 | December | 02 | 2005 |
| December | 10 | 2004 | March | 02 | 2005 | December | 07 | 2005 |
| December | 26 | 2004 | March | 03 | 2005 | December | 17 | 2005 |
| December | 27 | 2004 | March | 04 | 2005 | December | 18 | 2005 |
| December | 28 | 2004 | March | 09 | 2005 | December | 19 | 2005 |
| December | 29 | 2004 | March | 18 | 2005 | December | 20 | 2005 |
| December | 30 | 2004 | March | 19 | 2005 | December | 21 | 2005 |
| December | 31 | 2004 | March | 20 | 2005 | December | 22 | 2005 |
| January | 01 | 2005 | March | 21 | 2005 | December | 25 | 2005 |
| January | 02 | 2005 | March | 22 | 2005 | December | 26 | 2005 |
| January | 03 | 2005 | March | 23 | 2005 | December | 27 | 2005 |
| January | 04 | 2005 | March | 27 | 2005 | December | 28 | 2005 |
| January | 05 | 2005 | March | 28 | 2005 | December | 29 | 2005 |
| January | 06 | 2005 | March | 29 | 2005 | December | 30 | 2005 |
| January | 07 | 2005 | April | 03 | 2005 | December | 31 | 2005 |
| January | 08 | 2005 | April | 04 | 2005 | January | 06 | 2006 |
| January | 09 | 2005 | April | 07 | 2005 | January | 08 | 2006 |
| January | 10 | 2005 | April | 08 | 2005 | January | 13 | 2006 |
| January | 11 | 2005 | April | 22 | 2005 | January | 21 | 2006 |
| January | 12 | 2005 | April | 23 | 2005 | January | 03 | 2006 |
| January | 13 | 2005 | April | 27 | 2005 | January | 18 | 2006 |
| January | 16 | 2005 | April | 28 | 2005 | January | 11 | 2006 |
| January | 17 | 2005 | April | 29 | 2005 | January | 27 | 2006 |

## ATTACHMENT A

### Rain Dates, Aaron Metals, Oakland, California

| Month | Day | Year | Month | Day | Year | Month | Day | Year |
|---|---|---|---|---|---|---|---|---|
| January | 07 | 2006 | April | 04 | 2006 | February | 10 | 2007 |
| January | 01 | 2006 | April | 12 | 2006 | February | 11 | 2007 |
| January | 17 | 2006 | April | 02 | 2006 | February | 12 | 2007 |
| January | 30 | 2006 | April | 11 | 2006 | February | 21 | 2007 |
| January | 28 | 2006 | April | 16 | 2006 | February | 22 | 2007 |
| January | 02 | 2006 | May | 24 | 2006 | February | 23 | 2007 |
| January | 14 | 2006 | May | 19 | 2006 | February | 24 | 2007 |
| February | 17 | 2006 | May | 21 | 2006 | February | 25 | 2007 |
| February | 04 | 2006 | June | 28 | 2006 | February | 26 | 2007 |
| February | 02 | 2006 | July | 20 | 2006 | February | 27 | 2007 |
| February | 26 | 2006 | July | 06 | 2006 | February | 28 | 2007 |
| February | 01 | 2006 | July | 21 | 2006 | | | |
| February | 27 | 2006 | August | 02 | 2006 | | | |
| February | 28 | 2006 | October | 05 | 2006 | | | |
| March | 29 | 2006 | October | 06 | 2006 | | | |
| March | 17 | 2006 | October | 17 | 2006 | | | |
| March | 21 | 2006 | November | 02 | 2006 | | | |
| March | 11 | 2006 | November | 03 | 2006 | | | |
| March | 13 | 2006 | November | 04 | 2006 | | | |
| March | 30 | 2006 | November | 09 | 2006 | | | |
| March | 04 | 2006 | November | 11 | 2006 | | | |
| March | 10 | 2006 | November | 12 | 2006 | | | |
| March | 28 | 2006 | November | 13 | 2006 | | | |
| March | 07 | 2006 | November | 14 | 2006 | | | |
| March | 01 | 2006 | November | 15 | 2006 | | | |
| March | 02 | 2006 | November | 23 | 2006 | | | |
| March | 09 | 2006 | November | 27 | 2006 | | | |
| March | 27 | 2006 | November | 28 | 2006 | | | |
| March | 12 | 2006 | December | 09 | 2006 | | | |
| March | 03 | 2006 | December | 10 | 2006 | | | |
| March | 16 | 2006 | December | 11 | 2006 | | | |
| March | 31 | 2006 | December | 12 | 2006 | | | |
| March | 06 | 2006 | December | 13 | 2006 | | | |
| March | 24 | 2006 | December | 14 | 2006 | | | |
| March | 14 | 2006 | December | 15 | 2006 | | | |
| March | 20 | 2006 | December | 16 | 2006 | | | |
| March | 25 | 2006 | December | 22 | 2006 | | | |
| March | 05 | 2006 | December | 27 | 2006 | | | |
| April | 01 | 2006 | January | 04 | 2007 | | | |
| April | 17 | 2006 | January | 05 | 2007 | | | |
| April | 15 | 2006 | January | 17 | 2007 | | | |
| April | 08 | 2006 | January | 26 | 2007 | | | |
| April | 10 | 2006 | January | 27 | 2007 | | | |
| April | 09 | 2006 | January | 28 | 2007 | | | |
| April | 05 | 2006 | February | 07 | 2007 | | | |
| April | 03 | 2006 | February | 08 | 2007 | | | |
| April | 07 | 2006 | February | 09 | 2007 | | | |